Good morning, Your Honors. Good morning. And may it please the Court, I'd like to reserve three minutes for rebuttal. Okay. I'll try to help you here. Your Honors, the crucial issue in this case is whether the plaintiff's employer, BNSF Railway, could ignore the evidence that Mr. Alamillo's missed calls were due to sleep apnea. Well, wait a minute. Sure. I think under the law, Mr. Alamillo has to show that the sleep apnea was a substantial, motivating reason for BNSF's decision to terminate him. If I understand the evidence in this case correctly, the railroad didn't even know that he had this problem until after the decision was in process to terminate him or discipline him as a result of this action. Is that wrong? That is wrong, Your Honor. The railway knew that Mr. Alamillo had presented evidence, which has to be accepted as true in this context, that the missed calls were called by sleep apnea prior to the termination. Well, prior to the termination, but not prior to the time that they initiated the proceeding that resulted in the termination. Right? That's correct, that the investigations got underway before they learned about it. Isn't that really what we're talking about here? No. The adverse employment action in this case is the termination, and it's what does the company know at the time of the termination that it has to reasonably accommodate under the Fair Employment and Housing Act? And that goes to the intent of, you know, are they terminating him because of the sleep apnea? I want to be sure that I'm hearing what you're saying. It seemed to me that the termination hearings were proceeding prior to the time they knew about these problems, right? The timeline is that Mr. Alamillo missed a series of calls in early 2012, I think mostly between March and June. That's what I understood. Okay. And that they proceeded with termination proceedings. In other words, they were terminating him at that point, and they were doing their, if you will, due diligence on that. Well, they notified him that he was going to be the subject of an investigation on all of the missed calls and that the result of the investigation may be dismissal if the missed call charges are sustained.  And we're talking about the missed called. We're talking about not these missed calls, but the missed calls prior to starting this proceeding. There were a grand total, I believe, of seven missed calls in this case. Three of them were the subject of investigations ultimately. On one of them, which was not related to Mr. Alamillo's sleep apnea, it was related to poor cell phone service or his cell phone service being set up wrong. He was only getting international calls. On that, he got a 30-day record suspension, it's called. Well, that's the 28, 29, 31 calls. He chose to receive alternative handling, and he got discipline instead, right? In those prior calls, yes. As to those, 28, 29, 31. But there were also an August 2011 call and a March 16 call, March 18, March 20, April 23, May 13, May 21, and June 16. All of these prior to the things he's now saying are the problem. The two calls that he was terminated for were the May 21 and the June 16. I understand because all of the others had other resolutions. All I'm trying to make sure of is, as to the termination hearings, they all went on these prior calls, and then came these calls. There was no investigation on the prior calls. There was an investigation on three calls, the two that he got terminated on, the one that he got the 30-day record suspension on. The other ones were resolved with a more informal acceptance of a record suspension and discipline. Well, if you don't want to answer my question, that's fine. I'm sorry. But it doesn't seem to me that what we're doing as to the missed call to work on the extra board was a part of that termination proceeding. I'm sorry. Could you remind me? It doesn't seem to me that these calls we're now talking about or that you're now suggesting are a violation, a suit for wrongful termination, had anything to do with the calls that were a part of the termination proceedings. I think that we must be missing each other there because the May 21 and the June 16 missed calls that resulted in Mr. were two that he presented the evidence of sleep apnea on. If I'm missing your question, I respectfully request that you... Let me ask you this hypothetically since we seem to be trains passing in the night. Sure. Here's the evidence. If the reason that the railroad decided to terminate him had to do with the calls and when they initiated that they did not know about the alleged disability, doesn't that undercut your client's argument that his disability was a substantial motivating factor for the decision to terminate? It might undercut a disability discrimination claim. It does not undercut a failure to accommodate claim. A failure to accommodate claim as of the time that they learn about the sleep apnea, which is first in a meeting with Mr. Kershinger and then secondly when the evidence is brought to the investigation. As of the time that the railroad learns about the sleep apnea, it has a present ongoing perspective duty to accommodate at that point. Perspective is an important word, right? Sure. Not backward looking. Right. And doesn't the... Don't the Ninth Circuit's precedents say that included in the backward looking things that don't have to be accommodated is discipline for things that happened in the past? No, Your Honor. I don't believe that that is the correct reading of the Humphrey case in particular there or the Brundage case on the state level. On page three of the brief, the reply brief, I cite to Humphrey where, you know, the reason for termination has to be non-discriminatory. I'm sorry. Excuse me. All right. The record in this action contains substantial evidence suggesting that the misconduct was in fact a pretext for discrimination. In this case, we're turning to the prospective versus retrospective issue. Obviously, because we all move forward in time, an accommodation can only be prospective. In this case, the accommodation that was sought was to, A, not be terminated, B, to be put into a job that had regular working hours that, you know, would not going to cause him a problem for waking up in the morning. Those two things happened. Wasn't he offered the other job situation? It seems to me he did nothing to get a job with regular hours, set his alarm at 5, have his wife wake him up, get a landline, any of the other number of things he could have done to take care of this problem. He seemed to have no interest at all in doing anything until he was about to lose his job. Well, you have to recall that he wasn't diagnosed until July, okay, after the last missed call. He was offered that job, and he used his union seniority to bump somebody out of it, and he took that job. And when he did so, he had no more missed calls. Is that on the record? Yes, it's in the record. After he got in, basically, he did undertake affirmative steps on a prospective basis to correct the situation. Right. And the company allowed him to do that, and the company might have been obligated to allow him to do that on a prospective basis. But what cases hold that a reasonable accommodation includes excusing prior instances of falling short on the job? I think that that's the Humphrey case. I think that the Humphrey language- Humphrey about reasonable accommodation or about discrimination? The Humphrey case is about reasonable accommodation. Let me get it here. All right. The Humphrey Memorial-Humphrey v. Memorial Hospitals Association case, the language is it would be inconsistent with the purposes of the ADA, in our case the FEHA, to permit an employer to deny an otherwise reasonable accommodation because a past disciplinary action taken due to the disability sought to be accommodated. That's what's going on here. He missed calls because of sleep apnea. He sought accommodation of his sleep apnea. He was fired for missing calls that were due to sleep apnea. And that's illegal. That's a failure to accommodate. That's illegal under the FEHA. What is the effect of any of the administrative procedure here that happened? Well, the- As I understand it, he appealed this, if you will, termination under the administrative procedure that's allowed under railroad law. And at that point, he was notified that he could have his job but that he would not get paid back for what he had been previously terminated. That's exactly right. What's the effect of that? Effectively, it cut off his damages of two years. That's what happened. He missed two years of salary because of the two years that he was out of work. He's back at work now and has been working full time since. Does it have any other effect on our decision? No, Your Honor. Because? Because they're separate proceedings. That was a union arbitration to seeking reinstatement. And, in fact, the board that heard the case did accept the evidence of sleep apnea, accepted that he had treated it, accepted that he had undertook to remedy the situation, put him back to work. But other than that, no, it doesn't have an effect. Your Honor, I'm down to three minutes. Okay. Very good. Just to save the time, I'm going to hear from the railroad. Good morning, Your Honor. This is Ronald Novotny of BNSF Railway. Good morning. In trying to conceptually analyze this case, it really is just a wrongful termination case under California law based on the FEHA. And there are two prongs to that, reasonable accommodation and disability discrimination. And I think in going through this in the case law, the only proper way to look at this case is one of reasonable accommodation. Let me ask you a question. Just to get this off the top here, counsel relies heavily on the Humphrey case, which was decided before Harris and Wallace. Can you tell us why, in your view, if at all, that Humphrey really doesn't control this case? Absolutely. We have Humphrey involving a medical transcriptionist with obsessive compulsive disorder who had trouble getting out of her home in the morning and was penalized with tardiness and absenteeism points by her employer. At the end of her employment, she had a diagnosis, which they don't have. There is no diagnosis that his OSA had anything to do with his specific missed calls, nor could it. There's no diagnosis that he had that condition in May or June, or that they caused any of his missed calls, especially when you have in the same weeks him making all the calls. So there's a huge distinction there about causation. Assuming you didn't get there, I don't even think you have to. But anyway, you have the hospital then knowing of her condition and being ready to terminate her for tardiness and absenteeism. And as I recall, her asking for a leave of absence, and the hospital saying, no, you're terminated. Now, that case with these facts, Ms. Humphrey goes on her way and has these problems getting to work and doesn't go to a doctor and doesn't say a word about it and gets written up for tardiness and absenteeism and says she's sorry and that she'll do better and asks for an accommodation, asks to be able to work from home, but with no disability issue at all. And her employer says, like BNSF did here, you know, we've just decided to terminate you for all your tardiness and absenteeism. So, you know, we're going to make the termination interview next Friday so that your union can attend. And what Ms. Humphrey does is she goes out and gets a diagnosis and says, hot King's X, you can't fire me. It was all because of my OCD. There is no case anywhere that supports that. As Judge Otero found, no case anywhere. That's not Humphrey. Humphrey is where an employer who is continually dismissive of the person's problems decided to fire her in the face of evidence of her OCD causing the work-related problems. All BNSF did is, as you suggested, Your Honors, go through the normal procedure under the union contract. By the way, there were eight missed calls in the year. We excused two of them. There were six, ultimately, that he had that led to his termination. In March, three were rolled into one, so his next one was his fourth, okay? And he was terminated for the fifth and sixth, as he could have been under the PEPA policy, okay? So we have him going to the railroad and basically appealing the decision. All of them are entitled to investigations. It's under the Railway Labor Act, same as the Public Law Board arbitration, which is really not an arbitration. It's just a hearing. It's a way for the employees to argue that they should be reinstated, as he successfully did in that one. But anyway, the first hearing on his missed calls, by the way, as you see in the record, which you know he was aware of, would result in his termination. He was well aware of that. He calls up Rich Denison after his May 21st and says, you know, I'm done. I know that. So on that missed call, he gets an investigation notice for, I think, June 14th, two days before his last missed call. And his union says, this is common. We want to postpone it. We just want more time. They do that. You know, people are busy. Railroad is in no position to deny that. The union is the brotherhood of locomotive engineers. So, of course, whatever postponements they want, they get. And finally, we're here in August. Now, it just befuddles me how an employer who initially decided to proceed with the termination because of missed calls all of a sudden is motivated, substantially motivated, by someone's sleep apnea when he comes in with a diagnosis two months later. A diagnosis, again, I want to spend a little time on this, that says draft on it, that involves an initial meeting in July after all the missed calls, and that does not say one thing about whether he had this condition in May or June, and says this is generally consistent with this condition. In Humphrey, the doctor actually pegged it, you know, these problems getting out of the house in the morning are because of her OCD. So, again, there's nothing that even remotely supports a reasonable accommodation violation or disability discrimination violation in those circumstances. The DeWitt and McElwee cases established that retroactive leniency is not a reasonable accommodation. There is no obligation to accommodate conduct as opposed to a disability. That's in the briefs and cited. And, actually, it's only perspective in nature. The Wills case says that. I had another argument next door a few weeks ago, and I particularly like this site from a case called Wood v. Green out of the Third Circuit. A reasonable accommodation is one which presently or in the immediate future enables a qualified individual with a disability to perform essential job functions on the job in question. Okay, so, again, it's a future consideration that was being presented. Now, as I think counsel admitted, once we knew of it, he did ask for some help. He got a CPAP machine. We were helping him monitor it. He asked for and obtained this other job off the extra board and was working successfully in that. Sure, that's the kind of thing that an employer is obligated to do and that my to excuse past misconduct. The best authority for that is the reasonable accommodation guidelines. And I think, you know, you couldn't have anything more on point than question 36. A person with depression having trouble getting to work in the morning, often late like Humphrey was, and who tells him, and so the employer disciplines him for tardiness, stating that continued failure to arrive promptly during the next month will result in termination of his employment. The individual then explains that he was late because of a disability and needs to work on a later schedule. And here's the key. In this situation, the employer may discipline, may discipline the employee because he violated a conduct standard addressing tardiness that is job-related for the position in question and consistent with business necessity. Now, if they may discipline, how could they possibly have failed the reasonable accommodate him? And if they may discipline, how could they possibly discriminate against him based on his disability? Is it that you have to grant leniency in the context of discrimination but not a reasonable accommodation? No, that makes no sense. It really just completely disposes of both of their theories of liability, that authority. Now, that's guidance, but in a recent supplemental authority, we cited the California, the Court of Appeal, that actually the California FEHA requirements are granted on the reasonable accommodation guidance. They rely heavily on that. The Will's course cited to it. So this is law, and the cases are uniform with it, and there are no cases to the contrary. To rule that Mr. Alamillo was discriminated against or that we failed to accommodate him would be unprecedented. I think that it's also important that another case be considered possibly necessary. Supreme Court's decision in Raytheon versus Hernandez said that if you have a neutral, non-discriminatory policy for taking an employment action, you can't have a discrimination claim. That was a no-rehire policy that was exercised against someone who had some drug problems in the past. And here, we have a neutral, legitimate, non-discriminatory policy which was relied upon for the action that BNSF took. It's the PEPA policy. It's that, you know, five or more violations in one year may warrant dismissal. And there's no question we have the right to do that. I think there's some suggestion that the may somehow lets him argue that, well, we should have exercised our discretion to keep him. No, there's no law that says that, and the courts don't want to get involved in that, deciding whether someone gets a 30-day record suspension or dismissal for so many missed calls. We have the right to do that. And Raytheon versus Hernandez further supports that. On the causation issue also, page 66 of the record, and it's paragraph 102, there's an admission, no medical professional has stated specifically that the missed calls were due to sleep apnea. No medical professional has stated specifically that the missed calls were due to sleep apnea. That's what we're saying. And that distinguishes it from Humphrey completely. And I just want to say this. There was a question about the PLB. There was a suggestion somehow that the public law board's treatment of this evidence that wasn't really evidence of causation because they somehow agreed with his contention at that point, that this was something that he had, this condition that may have caused his missed calls. But that was somehow binding. And we cited the Grimes case, Grimes versus BNSF, and some supplemental authorities to the effect that the courts have complete discretion whether to consider those kinds of awards or not. And mind you, this is a public law board. It's a series of mainly non-lawyer arbitrators. There's no procedure. There's no due process. Even the investigation is not conducted under oath. It's like, if your honors are familiar with it, like a skelly hearing under state law. It's just a chance for someone to get their point across before something happens to them because they're represented by a union. And this is really just a step beyond that. The union obviously appeals any dismissals. They go and have these hearings en masse, and they decide favorably for some and unfavorably for another. But the comment in the public law board's holding to the effect that somehow his missed calls were caused by the sleep apnea is completely unfounded and not worthy of any deference whatsoever. And there's no authority submitted that it is. Let me just explore this one point with you. You've indicated that there was really no reliable evidence presented that Mr. Alamillo had sleep apnea. There was just a hurried review, said draft on it. Has the railroad made the point that there was no evidence presented that was a basis for even giving credibility to this claim? No, Your Honor. I don't think there's any question but that he had a sleep study and presented evidence at that point in time in August. He did it then? Yes, he had this condition. What I'm saying is there's no evidence that presented that that condition caused any of his missed calls. And one of our contentions is there's no way you could determine what caused someone to not wake up two or three months before a hearing. But our ultimate argument is it doesn't matter. Ultimately, we think it's a reasonable accommodation case. I think the best way to look at this is that the railroad terminated him despite his sleep apnea, not because of it. And that's a reasonable accommodation issue, despite his sleep apnea. It was aware of it, and it didn't matter to them when they decided whether he should be treated as other trained men were who missed calls because that's important for disciplinary purposes. They have uniform treatment and treat people who violate these rules alike. Then they decided to terminate him on that basis. The evidence is overwhelming. Mr. Kersinger decided, look, I just looked at the record. I didn't consider his sleep apnea. So he didn't consider it. How could it be a substantial motivation when they didn't even consider it? And that was his argument with the arbitration board, that they should have considered it. That's a reasonable accommodation issue. Well, counsel takes the position, your opposing counsel takes the position that as long as the railroad knew about the condition before the actual termination occurred, that's enough. What do you say to that? What I say is there's no authority for it, your honor, and my comments on Humphrey go right to that, how different that is from Humphrey. Thank you, your honor, unless you have any questions. No questions. Thank you, sir. All right, counsel, you've got a little rebuttal time. Briefly, your honor, I want to address particularly two issues. One is the railroad's assertion that the FEHA protects disabilities. It doesn't protect conduct. I know I'm not quoting Mr. Novotny directly there, but that was the thrust of it. That is completely inconsistent with Dark v. Curry, which is a case out of this court where the court wrote, with few exceptions, conduct resulting from a disability is considered to be part of the disability. That's on page three of the reply brief, rather than a separate basis for termination. Here, the conduct and the disability, I mean, the conduct was a symptom of the disability. The conduct was not waking up for work. How do we know that? Well, and that's the second point that I wanted to come to. The evidence that was presented in the investigations was an initial diagnosis by Dr. You know, preliminarily, you probably have obstructive sleep apnea. Sent him to a sleep study. They had the draft report there because the doctor hadn't signed it yet. It was on vacation. It was August. So he brought the draft report to the investigation. That draft report confirmed the diagnosis of obstructive sleep apnea. On top of that, Antonio Alamillo testified in the investigations, and all this stuff should be in the excerpts of record, that when he was prescribed the CPAP machine and began using it, he got immediate relief, and he stopped missing calls. Well, let's take all that as being true. The reality is, and I think I mentioned this before, there were many things he could have done even with sleep apnea, like having his wife wake him up, set the alarm clock earlier, have her listen to make certain he got up, et cetera, et cetera, et cetera. None of that was done, as far as I can tell. Do we have to assume that because he had sleep apnea that that was the cause, or does your client have to prove that that was the cause of his failure to wake up and appear? I think that there is enough evidence in the record for a jury to decide that the sleep apnea was the cause and that the other things that you raise go to the reasonableness of Mr. Alamillo's conduct, which is also a jury question. It's not a question of law. That's where I think that this, you know, ultimately we're talking about a determination that was made as a matter of law on summary judgment, and there are factual questions all over this place, all over this case. With that, thank you very much. Very good. Thank you both for your argument. We appreciate it, and the case just argued is submitted.
judges: M. Smith, N.R. Smith, Feinerman